Filed 2/10/21  In re J.F. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.F., a Person Coming Under the Juvenile Court Law. | B304143 |
| | (Los Angeles County Super. Ct. No. DK23787A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| K.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Michael Kelley, Judge.  Affirmed.

Mark L. Levinson for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

Keith C. (father) appeals from an order terminating his parental rights to five-year-old Jemma F. (born April 2015). Father argues that the juvenile court erred in terminating his parental rights. While father fails to cite any legal authority supporting his argument, he appears to be arguing that the juvenile court erred in declining to apply the beneficial parental relationship exception to termination of parental rights under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] Father also fails to provide any citations to the record in his opening brief supporting the factual basis for his argument.[2] "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Because father has failed to provide citations to legal authority or pertinent facts in his opening brief, we deem his argument to be without foundation and waived. (*Id.* at pp. 408; 418; *Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 743 ["Every argument presented by an appellant must be supported by both coherent argument and pertinent legal authority. . . . If either is not provided, the appellate court may treat the issue as waived"].)

Further, even if we were to consider the merits of father's argument, we would find that the record supports the juvenile

---

[1] Father has not cited this code section, nor any other legal authority, in his opening brief as support for his argument that the juvenile court erred. All further statutory references are to the Welfare and Institutions Code.

[2] In his reply brief, father provides five citations to the record, but no citations to legal authority.

2

court's determination that father did not play a parental role in Jemma's life, and instead provided nothing more than friendly interaction. Father's visits with the child were inconsistent and never liberalized. The record supports the juvenile court's determination that father did not meet his burden of proving that the termination of his parental rights would be detrimental to the child. Therefore, we affirm the judgment.

<b>FACTUAL BACKGROUND[3]</b>

**Family**

Father is the presumed father of Jemma (born Apr. 2015), and Sarah F. (mother) is the mother.[4] At the commencement of this case, Jemma resided with mother at the home of maternal grandparents. Mother and father were never married and had an "on again/off again" relationship. A family law order permitted father to visit Jemma on the first and third weekends of the month and every Wednesday evening for four hours.

**Initial referral and petition**

In July 2017, DCFS received a referral alleging that mother, who had struggled with alcoholism for many years, had been unable to resolve the problem. Mother drank to excess both inside and outside of her home, and was known to drive the child while under the influence of alcohol. The caller reported that the family was concerned for the safety of the child in mother's care.

---

[3]     Since father has failed to provide any citations to the record to support the factual statements in his briefs, we have relied on respondent's (Los Angeles County Department of Children and Family Services (DCFS)) citations supporting this factual background.

[4]     Mother is not a party to this appeal.

Mother reportedly had diagnoses of depression and bipolar disorder for which she took medication.

A DCFS social worker interviewed maternal grandparents and learned that mother had participated in two rehabilitation programs but had recently begun drinking again after one and one-half years of sobriety. Mother had driven Jemma while intoxicated a few times. Maternal grandparents wished to care for Jemma while mother participated in another rehabilitation program. Mother, age 32, was also interviewed. She reported drinking regularly since she was 18 years old. Mother stated that she and father had an amicable "on again/ off again" relationship. Mother wished to re-enroll in a drug treatment program and wanted maternal grandparents to care for Jemma while she was absent.

In a July 13, 2017 interview with a social worker, father admitted he had a prior case with DCFS regarding his older daughter as a result of his use of methamphetamines. Father had completed a drug treatment program and has been sober since 2010. Father was aware of mother's drinking, and that mother had driven with Jemma in the car while intoxicated since the maternal grandparents had informed him. Father stated that if he knew mother was drinking and driving with Jemma, he would have taken her car keys. Though father resided with paternal grandparents, he was trying to find a place of his own, and then he would apply for custody of Jemma.

Mother began outpatient treatment for her alcoholism on August 9, 2017. However, shortly thereafter, mother arrived home in the evening with Jemma stumbling and smelling of alcohol, after driving with two-year-old Jemma in the car.

Mother admitted to the relapse and to driving under the influence with Jemma in the car.

The social worker spoke with father on August 16, 2017. Father stated that due to his current living situation and his long work hours, he was not able to take custody of Jemma at that time. Father believed that maternal grandparents were good caretakers and a positive force in Jemma's life. Father agreed that maternal grandparents should care for Jemma at that time.

On August 22, 2017, DCFS filed a petition on behalf of Jemma pursuant to section 300, subdivision (b), alleging that mother had a history of abusing drugs and was a current abuser of alcohol; that father knew of mother's substance abuse and failed to protect the child; that mother drove a vehicle under the influence of alcohol while the child was a passenger in the car; and that mother suffered from mental and emotional problems including manic depression, bipolar disorder and post-traumatic stress disorder. The petition further alleged that father was unable to provide appropriate parental care and supervision of the child.

At the detention hearing, mother and father submitted to Jemma's detention from their care. The court ordered the child detained with maternal grandparents. Father was granted unmonitored visits.

**Jurisdiction/disposition**

Family members were interviewed again during the jurisdiction/ disposition period. Paternal grandmother stated that father was loving and attentive with Jemma and was good at feeding her and changing her diapers. Paternal grandmother wanted father to obtain his own residence so that he did not become dependent on her to care for the child. Maternal

grandmother reported that father loved Jemma and tried to help both Jemma and mother, however, "[t]hey are both addicts with addict behavior. Jemma is right in the middle of all their crap."

On October 19, 2017, the social worker asked father to test for drugs. Father agreed but did not test, reporting that his identification had expired. Father claimed he would obtain a new identification and then submit to an on-demand drug test. On November 1, 2017, father again declined to submit to a requested drug test due to his failure to have valid identification. When the social worker offered to take his picture and put it on a piece of paper to use as identification, father objected to submission to a drug test because he was not the reason that there was an open case with DCFS. Father reported that he was not using drugs. The social worker reported concern about father driving Jemma without a valid driver's license and car insurance.

In November 2017, Jemma's therapist reported that she had been meeting with Jemma and maternal grandmother consistently since October 2017. She was unsuccessful in her attempt to contact father and get him involved in the therapy sessions.

In December 2017, the social worker again attempted to get father to submit to a drug test. Again, father agreed, but then failed to appear for the drug test.

In early January 2018, father refused to submit to a drug test, stating that he was only in the case "voluntarily" to help mother, and refused to submit to a drug test.

In February 2018, father stated that he had moved out of paternal grandparents' home and was staying with friends, Gary and Brenda P. The social worker assessed the home and found

6

that it did not have appropriate bedding for father or Jemma. Father stated he would get a toddler bed as soon as possible.

The adjudication hearing was held on February 15, 2018. Mother and father signed waiver of rights forms, and the juvenile court sustained the petition under section 300, subdivision (b). The court declared Jemma a dependent child and ordered DCFS to provide reunification services. The court ordered father to participate in parenting classes, conjoint counseling with mother, and to submit to six consecutive random drug tests. Father was granted unmonitored visitation and DCFS was given discretion to release Jemma to him.

**Six-month reunification period**

Jemma continued to live with maternal grandparents. She was happy in the home and bonded to her caregivers. Mother participated in an outpatient drug program and completed a parenting class. Mother was arrested for driving under the influence on March 18, 2018, and tested positive for alcohol on May 30, 2018, and June 4, 2018.

The social worker attempted to discuss father's case plan with him but father did not understand why he had a case plan when the reason for the case was mother's alcohol abuse. On March 29, 2018, the social worker mailed father a referral packet with the court-ordered case plan and a letter with information on the required drug tests. On May 29, 2018, father responded that he received the referral packet and agreed with several items of the case plan, but did not agree with the order for drug testing because he felt his rights were being violated. Father claimed that he did not abuse any substances, worked full time, and did not understand why the court was requiring so much of him.

7

On June 14, 2018, when the social worker again asked father about drug testing, he responded that he did not want to drug test due to "the princi[ple] of the matter."  Father felt pressured and claimed he had trouble urinating with someone else present.  The social worker encouraged father to drug test and enroll in the other court-ordered programs.

On June 26, 2018, father's counselor informed the social worker that father had enrolled and participated in individual counseling and parenting classes.

At a Child and Family Team Meeting on July 3, 2018, father stated that he wanted Jemma to live with him.  Father reported that he would be willing to submit to a hair follicle test, but he might not have enough hair, as he had shaved off all of his hair.

Father offered to have the social worker observe him with Jemma to see his parenting skills and the bond he had with Jemma.  After the social worker made the appointment, father cancelled.  Another appointment was made for July 11, 2018, but father was not there when the social worker went to his home.

On August 16, 2018, the section 366.21, subdivision (e), six-month review hearing was held.  The juvenile court found that mother's and father's compliance had been "partial," and ordered DCFS to continue to provide family reunification services.  Father was ordered to submit to random, on-demand drug testing.  The court granted father's request to submit to a hair follicle drug test.

**18-month reunification period**

Father completed a 12-week parenting program and six weeks of individual and conjoint counseling.  He was reported to

have a positive attitude in both programs.  Father had still not submitted to drug testing.

Father continued to have unmonitored visits with Jemma, increased to every Monday and Wednesday for four hours each visit, every other Friday, and every other weekend. Father's work schedule sometimes interfered with his visits, and when it did, father would only visit with Jemma on Fridays and every other weekend.  The maternal grandparents reported that Jemma was happy to see father and to go with him on the visits.  Father requested overnight unmonitored visits.

Maternal grandmother expressed concern that father was driving Jemma without a valid driver's license.  Sometimes father would park around the corner and walk to the maternal grandparents' home to get Jemma.  Maternal grandmother complained that father did not speak to the maternal grandmother, often did not confirm visits, and showed up late without calling.  Father changed the time of his visits to accommodate his work and softball game schedules, and was not consistent with his visitation times.

Father had not completed the court order for six consecutive drug tests, claiming that he did not know about the order.  When reminded about the hair follicle drug test, father stated that the test was never set up for him.

An assessment of father's home was scheduled for December 7, 2018.  The social worker sent father a text message reminding him of the appointment, however, when the social worker arrived at father's home, he was not there.  Father later stated that he went to work and forgot.  When the social worker asked father about drug testing, father again objected because the child had been detained due to mother's substance abuse.

Father stated that he shaved his head and did not have enough hair for a hair follicle test.

A hair follicle test for father was scheduled for February 8, 2019.  On February 7, 2019, the social worker told father it was important that he not miss the test.  On February 8, 2019, the social worker went to father's home, but he was not there.  The social worker later learned that father failed to appear for the hair follicle test.

On March 29, 2019, the social worker contacted father by text message and asked when they could meet at father's home.  Father offered to meet the following Tuesday at 5:00 p.m.  However, when the social worker texted to confirm the appointment the following Tuesday, father replied that he would not be home because he was helping a friend move.

On April 5, 2019, the social worker contacted father about his failure to drug test.  Father again complained that he should not be required to test because he was a "non-offending parent."  On Tuesday, April 9, 2019, the social worker met with father at father's home and received a tour of the home, which was clean and appropriate with no visible safety hazards.

On May 7, 2019, the maternal grandfather contacted the social worker about an incident with father.  Father was late to pick up Jemma.  Maternal grandparents contacted father 30 minutes after the scheduled visit time and canceled the visit.  Father became angry and came to maternal grandparents' home, but they did not allow the visit to occur.  Maternal grandparents requested that father's pick-ups and drop-offs occur at a police station.

On May 21, 2019, the court held the 18-month review hearing.  Father's counsel requested that Jemma be returned to

father's care.  Jemma's counsel requested that the juvenile court terminate reunification services, arguing that father refused to submit to drug tests, and that father's drug use was an issue, based on the previous case with father's older daughter.  The juvenile court found that father was not in substantial compliance with the case plan and terminated reunification services.  The court continued the matter for a section 366.26 hearing to select a permanent plan for Jemma.

**Selection of permanent plan and termination of parental rights**

Maternal grandfather reported that in June 2019, father called and asked them to pick up Jemma because father was at a party and had been drinking alcohol.  Maternal grandfather was concerned about who was watching Jemma while father was drinking.

Father had moved in with a girlfriend and her three children.  Father's weekend visits with Jemma had remained consistent, but his Monday and Wednesday evening visits were not.

In a report dated September 3, 2019, DCFS recommended adoption by maternal grandparents to be the permanent plan for Jemma.  The maternal grandparents were committed to adopting Jemma, and she was thriving in their loving and stable home.

On November 7, 2019, father was asked to submit to a drug test the following day.  Father did not comply because he had plans to leave town.  The test was rescheduled for November 12, 2019.  Father appeared and tested negative for drugs.  The social worker informed father that he should submit to a random drug test, not a scheduled one.

On November 18, 2019, the juvenile court held the section 366.26 hearing to select and implement a permanent plan for Jemma. Father objected to DCFS's plan to terminate his parental rights. Father testified that he was able to care for Jemma; that he had recently tested negative for drugs; and that he had also submitted to three drug tests for his employer, all of which were negative. Father stated that maternal grandparents were unwilling to modify the visitation schedule for him, but he was always agreeable to any modification that they requested. Father admitted that he sometimes returned Jemma late to their care, but he would always inform them in advance.

Maternal grandfather testified that father was late bringing Jemma home 65 percent of the time. On two occasions, father asked maternal grandparents to pick up Jemma. One was the incident during which father was drinking alcohol, and another was a time when he had back to back softball games. After returning from a visit with father, Jemma had trouble settling down.

Maternal grandmother testified that she had informed father about Jemma's first days of school. Father attended one, but was unable to attend the other. Maternal grandmother also occasionally informed father of Jemma's medical and dental appointments. Father had attended one or two appointments. Maternal grandmother described her relationship with father as "strained," but she hoped they could be good friends someday.

The hearing was continued for argument to November 22, 2019. Father's counsel argued that he had maintained visitation as best he could. He was not able to make all the medical and dental appointments because mother and maternal grandmother had not provided him with all the necessary information.

12

Father's counsel argued that father's bond with Jemma was strong, as he had spent time with Jemma and consistently requested more visitation.

Both mother's and Jemma's counsel consented to DCFS's recommendation that mother's parental rights be terminated in favor of adoption by the maternal grandparents.

The court took the matter under submission and on December 10, 2019, the juvenile court found by clear and convincing evidence that Jemma was adoptable. The court further found that father had not met his burden of showing a parental bond under the exception to termination of parental rights. The court described father's visitation as "episodic at best." The court noted that father only began weekday visits after termination of reunification services. The court further found that father had not engaged in activities associated with a parental role, concluding that father's bond with Jemma was "tenuous" and did not "rise to the level of a bond that would outweigh the statutorily mandated preference that minors be provided permanence and stability." The court terminated mother's and father's parental rights and freed Jemma for adoption.

On February 4, 2020, father filed his notice of appeal from the orders issued at the permanency planning hearing.

## DISCUSSION

## I. Father has waived any issues on appeal

In both his opening and reply brief on appeal, father has failed to provide citations to pertinent legal authority. Father also failed to provide citations to the record in his opening brief. Due to his failure to cite any legal authority supporting his appeal, father has failed to clearly articulate any legal argument.

"Dependency proceedings in the juvenile court are special proceedings with their own set of rules, governed, in general, by the Welfare and Institutions Code." (*In re Chantal S.* (1996) 13 Cal.4th 196, 200.) In his opening brief, father cites only one code section: section 331, which father claims authorizes his appeal. In fact, section 331 does not provide authority for father's appeal.[5] Father cites no other legal authority at all, statutory or common law, thus provides no legal basis for any argument that the juvenile court erred.

Further, father's appeal violates the California Rules of Court. Under rule 8.204(a)(1)(A), each brief must "[b]egin with a table of contents and a table of authorities separately listing cases, constitutions, statutes, court rules, and other authorities cited." Father has included a table of authorities in his opening brief, but it cites only section 331, the purported authority for his appeal, which is an irrelevant statute. In his reply brief, father failed to include a table of authorities. Father cites no legal authority at all in his reply brief.

Pursuant to rule 8.204(a)(1)(B), an appellant is required to "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." Father cites no pertinent authority at all in either his opening brief or his reply brief.

---

[5] Section 331 provides: "When any person has applied to the social worker, pursuant to Section 329, to commence juvenile court proceedings and the social worker fails to file a petition within three weeks after the application, the person may, within one month after making the application, apply to the juvenile court to review the decision of the social worker, and the court may either affirm the decision of the social worker or order him or her to commence juvenile court proceedings."

14

Pursuant to rule 8.204(a)(1)(C), an appellant must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." In spite of pages full of argument regarding the facts of the case, father has failed to provide any record citations in his opening brief.

As the appellant, father bears the burden of demonstrating error, through meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. (*In re S.C., supra*, 138 Cal.App.4th at p. 408.) Father has failed to meet this burden. Because father has failed to provide citations to legal authority and pertinent facts, we deem his argument to be without foundation and waived. (*Id.* at pp. 408; 418; *Kaufman v. Goldman, supra*, 195 Cal.App.4th at p. 743.)

## II. The juvenile court did not err

DCFS assumes that father intended to argue that the juvenile court erred in declining to apply the beneficial parental relationship exception to termination of parental rights under section 366.26, subdivision (c)(1)(B)(i). Although father has not cited this statute, nor any law interpreting the provision, we briefly address it. Father has failed to show that the juvenile court erred in declining to apply this exception to termination of father's parental rights.

Section 366.26, subdivision (c)(1)(B)(i) provides that if a child is adoptable, the court shall order a plan of adoption unless (1) the parent has maintained regular visitation and contact with the child, and (2) the child would benefit from continuing the relationship. A juvenile court's findings under section 366.26 are usually challenged for sufficiency of the evidence. "The appellant

has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Courts have applied both the substantial evidence standard and the abuse of discretion standard to the two components of the exception to termination of parental rights found in section 366.26, subd. (c)(1)(B)(i). (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) The two standards are similar, giving broad discretion to the factual determinations of the juvenile court. (*Ibid.*)

### A. *Father failed to show consistent visitation*

As the juvenile court noted, father's visitation with Jemma was inconsistent, or "episodic at best." The court noted that father only began weekday visits after termination of reunification services. While father complains on appeal that the maternal grandparents restricted his visitation, father fails to provide a citation to the record showing that he complained of any such obstacles to DCFS.

Further, while father claims that he consistently sought liberalization of his visits with Jemma, he also failed to drug test as required. DCFS could not use its discretion to liberalize father's visits until father complied with the court's orders to submit to random drug testing. Father never did so, and his visits were never liberalized to overnight visits. At the May 21, 2019 section 366.22 hearing, father's counsel specifically

16

requested that Jemma be placed in his care.  The juvenile court found father's refusal to drug test to be a factor in its decision to terminate reunification services. The court noted that drug testing was court ordered, and father had not complied.

In addition, there was evidence that father did not take full advantage of the visits he was permitted.  While he consistently visited with Jemma on the weekends, his weekday visits lacked consistency.  Under the circumstances, the evidence supports the juvenile court's decision that father's visitation with Jemma was inconsistent.

### B.  Father failed to show detriment to Jemma

The "'benefit from continuing the [parent/child] relationship'" exception means "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

The evidence in the record supports the juvenile court's decision that maintaining father's relationship with Jemma would not outweigh the benefit she would gain from being adopted by the maternal grandparents.  Jemma never lived with father.  Instead, she lived with the maternal grandparents from the inception of this case until the order terminating parental

17

rights.  Thus, she lived with maternal grandparents for most of her life, and saw them as her caregivers.  Father did not engage in the activities expected of a parent.  He did not attend all, or even most of the medical, dental and school appointments that he was invited to attend.  Father would take Jemma to a restaurant or a park where he played softball.  While these visits provided pleasant and friendly interactions, father did not engage in the types of activities that demonstrate a parental role.  Under the circumstances, the juvenile court did not err in determining that father had failed to meet his burden of showing that the termination of his parental rights would harm Jemma to such a degree as would outweigh the benefit to her of being adopted by her maternal grandparents.

## DISPOSITION

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.

CHAVEZ

We concur:

_____, P. J.

LUI

_____, J.

HOFFSTADT

18